OPINION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas, Domestic Relations Division which granted the parties, plaintiff-appellee/cross-appellant Philip L. Treuhaft ("appellee") and defendant-appellant/cross-appellee Deborah B. Treuhaft ("appellant"), a divorce, awarded the parties their separate property, divided the parties' assets and liabilities and awarded appellee partial attorney fees. Appellee also has pending before this court a motion for an award of attorney fees and costs incurred in this appeal.
Appellee and appellant were married on November 14, 1975. Thereafter, appellee adopted appellant's then five year old daughter, Gretchen, who is now fully emancipated. There are no other children of the marriage. When the parties married, appellee was forty-nine years old and appellant was twenty-seven years old. Prior to the marriage at issue herein, appellee was married for thirty years to Blossom Treuhaft, from whom he was divorced in October 1975. Pursuant to the terms of the divorce decree in that case, appellee was obligated to pay Blossom Treuhaft annual spousal support of between $11,000 and $19,000, depending upon appellee's annual income, until Blossom's death or remarriage. Appellee was also obligated to maintain a $100,000 life insurance policy with Blossom as the beneficiary.
Throughout their marriage, the parties bought and sold a number of properties and were involved in several businesses. That history is as follows.
When the parties married in 1975, appellee was working for Pet Bazaar and for the Walford Stores. The Walford Stores were small department stores which appellee owned with his two brothers. Prior to his marriage to appellant, appellee's interest in the Walford Stores had a "book value" of $57,996. However, because the Walford Stores were privately held, the fair market value of appellee's interest was never established. Pet Bazaar was a publicly owned company that operated pet stores in shopping malls. Appellee also had an ownership interest in Pet Bazaar which was valued at $10,974. Appellee operated Pet Bazaar full-time and worked for Walford Stores part-time. At the time of their marriage, appellant worked as a paralegal, but after their marriage, she worked as a bookkeeper for the Walford Stores.
Shortly after their marriage, the parties purchased their first house at 4227 Colony Club, Port Clinton, Ohio. The parties paid $60,500 for the house with a down payment of $12,874. Of the down payment, $500 came from the parties' joint checking account and the remainder came from loans from the Walford Stores and appellee's cashing out of a profit sharing plan. Both parties were listed as grantees on the deed to this property.
In 1978, the parties purchased Shoe Dock, a retail shoe business, from the Walford Stores and thereafter incorporated it as Shoe Dock, Inc. In order to effectuate the purchase, appellee exchanged his interest in the Walford Stores for Shoe Dock and the parties signed a promissory note for $27,500. The parties each owned fifty percent of the outstanding stock in Shoe Dock, Inc., appellant managed the Shoe Dock store in Port Clinton, Ohio and appellee maintained the journals, ledgers and cash register receipts for the business. At this time, appellee also continued to work for Pet Bazaar.
In 1979, the parties purchased three pet stores from Pet Doctors, and incorporated their new business under the name Pet Dock, Inc. Again, the parties were equal shareholders in the business. Although the parties paid no money up front for the business, they did execute a promissory note to the seller. Appellee oversaw the complete operation of the business, although the stores had individual managers. Appellant maintained the papers for registered dogs while she continued to manage Shoe Dock. The Pet Dock stores were located in three shopping malls in the Toledo, Ohio area, including Southwyck Shopping Center ("SSC"). SSC required appellee to sign personally on the lease to maintain the store in that mall. In 1979, the parties also purchased a lot on North Carriage Lane in Port Clinton, Ohio on which they planned to build a house. The parties paid $18,000 for the lot which was titled in both of their names. $9,000 for the down payment came from a loan from appellant's father. Appellee testified below that the remaining $9,000 may have been borrowed from one of the parties' businesses but there was no evidence to support this. Ultimately the loan from appellant's father was repaid from the parties' joint funds.
In August 1980, appellee quit-claimed his interest in the Colony Club Drive and North Carriage Lane properties to appellant. Because he had signed personally on the SSC lease, appellee testified that he wanted to reduce his personal liability. In July of that same year, the parties purchased commercial real estate at 115 Madison Street, Port Clinton, Ohio for $75,000. Although no cash was exchanged in the transaction, the parties each signed two promissory notes for the property, one fifteen year note for $70,000 and one three year note for $5,000. Although both of the parties signed the notes, the property was listed in appellant's name alone. The parties then moved Shoe Dock into the first floor of the property, changed it's name to Shoe Dock d/b/a "Deborah's," and rented out the second floor to a ballet school and as an apartment. Appellee also used part of the second floor as his office. The rent collected from Deborah's and the other tenants covered the mortgage payments and expenses for the property.
In July 1985, appellant sold the Colony Club Drive home for $120,000. The proceeds from the sale, $80,709, were used to construct a home on the North Carriage Lane property. The parties borrowed an additional $80,000 for this construction and that mortgage was satisfied in December 1986.
In January 1987, the parties purchased a commercial property at 117 East Second Street in Port Clinton with partners Randy and Vickie Dykstra. The purchase price of the property was $90,000 with a down payment of approximately $12,000. Of that down payment, $6,000 came from the parties' joint checking account. Appellant testified below, however, that appellee put no money into the partnership and that she and the Dykstras were the only partners in the venture.
In June 1989, the parties sold the three Pet Dock stores to Jack and Dolores Bower for $100,000. Because the Bowers were only able to take over one store every three to four months, appellee continued to work at the stores until March 1990. Thereafter, appellee became a real estate agent. Throughout this time, appellant continued to work for Shoe Dock, Inc. d/b/a/ Deborah's. Later in October 1989, the parties bought a condominium at 29 Grande Lake Drive in Port Clinton, with the expectation that they would live part of the year in Port Clinton and part of the year in a southern vacation home. The purchase price of the condo was $106,500 of which the parties made a down payment of $500. The balance due was secured by a mortgage that was in both parties' names but the property was titled in appellant's name alone. That condominium was subsequently sold for a nominal profit.
In March 1990, the parties purchased vacation property in Fripp Island, South Carolina for $77,500. Ultimately, the parties intended to use this as a retirement home. To effectuate that purchase, the parties borrowed the $6,475 down payment from their daughter Gretchen's savings. Although the property was titled in appellant's name alone, appellee's name was on all of the mortgage papers relating to the purchase. Also in 1990, appellee began accumulating an arrearage on his support payments to his first wife. In September 1990, in order to protect his assets from attachment, appellee transferred ownership of a $200,000 life insurance policy to appellant and cashed in his IRA valued at $55,232. Appellant then distributed the proceeds from the IRA as follows: $36,961 was used to reduce the outstanding mortgages on the North Carriage Lane property; $8,400 was paid toward Gretchen's college tuition; $4,000 was paid in federal income taxes; $850 was paid in state taxes; $3,000 was paid in attorney fees; $1,500 was paid in accountant fees; and $389 was paid toward miscellaneous bills.
Toward the end of 1990, the Bowers, the purchasers of Pet Dock, were in financial trouble and ceased making payments to appellee. In addition, appellee's former wife, Blossom Treuhaft, obtained judgments against appellee for $6,318, representing a support arrearage, and $1,088 representing insurance payments that Blossom made to maintain an insurance policy on appellee's life. In that action, appellee testified that he did not own any real property and that all of the properties discussed herein were owned by appellant. Also toward the end of 1990, appellant sold the assets of Shoe Dock for $53,226. Under the terms of the sale and confidentiality and non-competition agreement, appellant was to receive seventy-two monthly payments of $1,239.
In 1991, Blossom Treuhaft again brought an action against appellee for unpaid spousal support and unpaid life insurance premiums. Blossom joined appellant as a defendant in that suit claiming that appellee had conveyed assets to appellant for the purpose of defrauding Blossom and that appellant assisted appellee in concealing those assets. To settle the action against her, appellant paid Blossom $20,400. Appellee reached a separate settlement with Blossom under which he acknowledged a support arrearage of $25,518, paid Blossom $10,000 toward that arrearage, assigned to her $600 per month from his social security retirement benefits, and agreed to maintain a life insurance policy as security for payment of the remaining alimony due so that should appellee fall behind in his future support payments to Blossom, she would have a lien on that policy of up to $50,000.
At approximately the same time, SSC brought an action against appellee for breach of the lease agreement which he had personally signed when the parties owned Pet Dock. Ultimately, SSC recovered a $75,000 judgment against appellee in that action. SSC then brought an action against appellant in an attempt to set aside appellee's conveyances of property to her as fraudulent. Appellant subsequently settled that lawsuit by paying SSC $25,000. That settlement released appellant from any liability she had to SSC.
On April 1, 1993, the parties separated, and in June 1993, appellant sold the North Carriage Lane home for $400,000. At the closing, appellant received $54,844, which she placed in her retirement account at Savage Associates. She also received a promissory note for $100,000 due in June 1998. An additional $100,000 was placed in escrow. It is from that escrowed amount that appellant paid $20,410 to appellee's ex-wife and $25,000 to SSC. Appellant also paid attorney fees from the escrowed funds. The remainder was paid to her.
In May 1994, appellant purchased a residence at 6010 Centennial Road, Sylvania, Ohio for $124,000. She made a down payment of $20,532, which came from the proceeds from the sale of the North Carriage Lane property. Again, the property was titled in her name alone and appellee waived his dower interest in the property. Subsequently, appellant leased the home to a friend for $850 per month.
In January 1995, appellant and the Dykstras sold the Second Street commercial property for $125,000. From that sale, appellant netted $27,278, of which she gave appellee $1,000 as a birthday gift. Appellant then deposited $15,000 into her account at Savage Associates, paid a $4,500 Master Card bill which she had incurred after loaning appellee $5,000 for partial payment of the SSC judgment, and paid $5,000 toward other personal bills.
In December 1995, appellant purchased a home at 4342 Old Saybrook in Toledo, Ohio for $195,000. The property was titled in her name alone and appellee waived his dower rights in the property. Appellant made no down payment for the home but took out a first and second mortgage on the property.
On May 17, 1996, appellee filed for divorce. Appellant then answered and filed a counterclaim for divorce. Upon the filing of the complaint, the court issued an order enjoining the parties from selling or disposing of any and all real or personal property owned by both or either spouse. Nevertheless, on July 15, 1996, appellant sold the Fripp Island property in South Carolina for $135,000, netting $63,396. From the proceeds of that sale, appellant used $40,000 to pay off a bridge loan in connection with her purchase of the Old Saybrook property and used the remaining money to pay Gretchen's debts and pay for her education. On July 29, 1996, appellee filed a motion to show cause and for attorney fees regarding appellant's sale of the Fripp Island property. On February 28, 1997, the lower court filed a decision and judgment entry finding appellant in contempt for selling the Fripp Island property. The court then ordered appellant to provide appellee with an itemized accounting of all of the proceeds from the sale of the property and ordered her to pay partial attorney fees to appellee of $1,000.
The case proceeded to a trial on June 18 and 20, 1997. Initially the parties entered into the following stipulations: that the fair market value of the 115 Madison Street property was $162,500; that the fair market value of appellant's 1994 Cadillac Seville was $21,400; that each party shall keep all of the artworks in their respective possessions except that appellant shall return to appellee "Marketplace" by Shlomo, "Simchat Torah" by Moskowitz, the Monet, the Renoir, Jerusalem art work, the large menorah and the mezuzah; and that Gretchen shall receive all personalty in appellant's possession previously belonging to appellee's mother. The parties then testified to the facts as set forth above. Further testimony revealed that throughout their marriage the parties maintained a joint checking account into which they deposited all of their income from all sources and from which they paid all of their bills. At the time of the trial, appellee owned a 1989 Buick Riviera worth $2,411. The parties also had artwork and personal property and appellant had a retirement account at Savage Associates valued at $112,307.
The parties further testified as to their incomes and expenses as follows. Appellant worked approximately thirty-nine hours a week as a paralegal from which she earned $16 per hour. She also received $850 per month in rent from the Centennial Road property, $1,750 per month in rent from the Madison Street property, and $7,250 per year in interest payments on the $100,000 note due her in June 1998. Appellant's Schedule III listed her monthly expenses as $6,600 and installment payments, before the sale of Fripp Island, as $4,365. Appellee works as a real estate agent from which his 1996 taxable income was $2,526. He also receives social security benefits of $1,064 per month from which $600 per month is paid to his former wife. Appellee lives rent free in the apartment in the Madison Street building and at the time of the trial below had monthly expenses of approximately $1,500.
On February 2, 1998, the trial court issued the decision which is the subject of this appeal. Before setting forth the distribution of property, the court addressed the issue of the duration of the marriage and found that it would be inequitable to set the termination date of the marriage as the date of the final hearing. Finding that the parties had lived separate and apart since April 1, 1993, had separate business interests since then and had not commingled any monies since then, the court set that date as the defacto termination date of the marriage. The court then determined the parties' separate property. Although appellee had claimed his stock in Walford Stores and Pet Bazaar, a 401(K) plan, and the cash surrender value of certain life insurance policies as his separate premarital property, the court determined that appellee had failed to establish the value of those properties at the time of his marriage. In particular, the court noted that the fair market value of the Walford Stores stock was never established and appellee wrote off his interest in Pet Bazaar on the parties' tax returns when the company went out of business. The court then awarded appellee his jewelry and his Veteran's Administration life insurance policy as his separate property. With regard to appellant, the court awarded her as her separate property the jewelry appellee had given her during the marriage and all of the property she had acquired after April 1, 1993, including the Centennial Road property, the Old Saybrook property, her Cadillac, and all contributions she had made to her Savage Associates account. In awarding this property to appellant, however, the court recognized that appellee did have a marital interest in some of the property.
The court then determined that the marital estate consisted of the following: the Madison Street property, $162,500; the marital portion of the Centennial Road property, $35,500; the marital portion of the Old Saybrook property, $40,000; the promissory note due in June 1998, $100,000; the Savage 
Associates retirement account, $112,307; the cash surrender value of appellee's life insurance policy, $14,525; the cash surrender value of appellant's life insurance policy, $2,357; appellant's 1994 Cadillac, $21,400; appellee's 1989 Buick, $2,411; appellee's personal property, including furniture and appliances, value unknown; appellant's personal property, $8,050; proceeds from the sale of the assets of Shoe Dock, Inc., $89,226 plus interest; proceeds from the sale of the Second Street property, $11,277; and proceeds from the sale of the Fripp Island property, $63,396. The court then determined that the value of the entire marital estate was $662,949. In dividing the marital estate, the court determined that it would be inequitable to divide it evenly given appellee's past conduct with regard to the very same assets. That is, given that in previous litigation before both the domestic relations court and the common pleas court, appellee stated under oath that he had no financial interest in the various real properties owned by appellee. As a result of those sworn statements, appellee was able to reduce his obligations to the plaintiffs in those actions. The court below, therefore, refused to reward appellee for his past misconduct. The court, however, further recognized that appellant was not an innocent bystander to appellee's prior financial dealings. The court, therefore, did award appellee a portion of the marital estate. Specifically, the court awarded appellee the Madison Street property; one-half ownership of the Columbus Mutual life insurance policy, including one-half of the cash surrender value; the 1989 Buick; and $27,600 of appellant's Savage Associates retirement account, all totaling $199,773. The court awarded the remaining $463,175 in marital assets to appellant.
The trial court next addressed the issue of spousal support and determined that appellee had not established a need for spousal support at that time. However, the court further found that its determination was subject to modification within a period of four years from the date of the judgment entry of divorce upon appellee's showing of a substantial change of circumstances affecting his earning ability.
Finally, on the issue of attorney fees, the court awarded appellee partial attorney fees of $9,000.
On March 27, 1998, the trial court filed the final judgment entry of divorce. It is from that judgment that the parties now appeal. Appellant has raised the following assignments of error:
 "I. THE TRIAL COURT'S FINDING OF FACT AT PAGE 20 OF IT'S DECISION AS TO MARITAL PROPERTY IS IN ERROR BASED ON THE EVIDENCE PRESENTED AT TRIAL AS THE TRIAL COURT INCORRECTLY IDENTIFIED ASSETS AND ALLOTTED VALUES TO PROPERTY THAT WERE NOT IN EXISTENCE AT THE TIME OF THE DIVORCE; VALUED ASSETS TWICE IN IT'S [SIC] COMPUTATION, RESULTING IN A MARITAL DISTRIBUTION, WHICH ALLOCATES NON-EXISTENT ASSETS, AND; WHILE AWARDING THE APPELLANT ALL OF THE PROPERTY WHICH SHE ACQUIRED SUBSEQUENT TO THE DATE OF THE SEPARATION OF APRIL 1, 1993, FAILED IN IT'S [SIC] DISTRIBUTION, WHEREBY, THE TRIAL COURT INCLUDED THOSE EXCLUDABLE ASSETS AS PART OF THE MARITAL MIS [SIC] AND DISTRIBUTION.
 "II. THE TRIAL COURT ORDERED THE DISTRIBUTION OF AN INSURANCE POLICY BASED UPON ITS CASH SURRENDER VALUE, HOWEVER, THE POLICY WAS ENCUMBERED BY A PREVIOUS COURT ORDER, THEREFORE, THE POLICY HAS NO VALUE.
 "III. THE TRIAL COURT ERRED IN ORDERING THE APPELLANT/DEFENDANT, DEBORAH TREUHAFT, TO PAY A PORTION OF THE APPELLEE/PLAINTIFF'S ATTORNEY FEES.
 "IV. THE TRIAL COURT ERRED BY ATTEMPTING TO RESERVE JURISDICTION TO AWARD SPOUSAL SUPPORT AS [SIC] SOME FUTURE TIME, AFTER THE TRIAL COURT FOUND THAT SUCH AN AWARD WAS NOT NECESSARY AT THIS TIME."
Appellee has asserted the following additional assignments of error:
 "I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DID NOT ORDER THE APPELLANT TO PAY SPOUSAL SUPPORT TO THE APPELLEE.
 "II. IT WAS AN ABUSE OF THE TRIAL COURT'S DISCRETION TO AWARD APPELLANT MORE THAN FIFTY [SIC] (50%) OF THE MARITAL ASSETS DUE TO APPELLEE'S PAST CONDUCT.
 "III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT AWARDED APPELLEE PARTIAL ATTORNEY FEES.
 "IV. APPELLANT SHOULD PAY THE COSTS AND ATTORNEY FEES THAT APPELLEE INCURS IN THE PROSECUTION OF THIS APPEAL."
Because appellant's first and second assignments of error and appellee's second assignment of error challenge various aspects of the trial court's distribution of the marital property, we will address those assignments of error together.
A trial court is vested with broad discretion when fashioning its division of marital property. Bisker v. Bisker
(1994), 69 Ohio St.3d 608, 609. In the usual case, the law requires that the marital property be divided equally. R.C.3105.171(C)(1). If, however, an equal division would produce an inequitable result, the property of the parties must be divided in such a way as the domestic relations court determines to be equitable. R.C. 3105.171(C)(1); Baker v. Baker (1992), 83 Ohio App.3d 700,702. In making a division of marital property, the trial court is required to consider the factors set forth in R.C.3105.171(F):
"(1) The duration of the marriage;
"(2) The assets and liabilities of the spouses;
 "(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;
"(4) the liquidity of the property to be distributed;
 "(5) The economic desirability of retaining intact an asset or an interest in an asset;
 "(6) The tax consequences of the property division upon the respective awards to be made to each spouse;
 "(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;
 "(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;
 "(9) Any other factor that the court expressly finds to be relevant and equitable.
This court, when reviewing a trial court's property division, must consider the distribution in its entirety under the totality of the circumstances. Jelen v. Jelen (1993), 86 Ohio App.3d 199,203. We cannot reverse the trial court's judgment absent an abuse of discretion, that is, unless the trial court's decision is unreasonable, arbitrary or unconscionable. Booth v.Booth (1989), 44 Ohio St.3d 142, 144; Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
In his second assignment of error, appellee asserts that the trial court erred in awarding appellant more than fifty percent of the marital property due to appellee's past conduct with respect to the very same assets.
In its decision, the lower court turned to the catch-all provision, R.C. 3105.171(F)(9), as support for its decision to award appellee less than fifty percent of the marital property. The court determined that R.C. 3105.171(F) was "broad enough to include generally accepted principles of equity jurisprudence. This would include, at a minimum, the `clean hands' doctrine;i.e., that the person invoking the equitable jurisdiction of the Court must not have `dirty hands', [sic] or that the person `seeking equity' must have `done equity'." Based on this principle, the court held that it would be inequitable to equally divide the marital estate because appellee had previously misrepresented his interest in the assets to which he now claims he is entitled.
Initially we note that the fact that appellee had previously sworn that he had no interest in the properties at issue does not make the properties non-marital for purposes of distribution under R.C. 3105.171. R.C. 3105.171(B) provides that in a divorce proceeding, the trial court must determine what constitutes separate property and what constitutes marital property for purposes of division. "Separate property" is defined in pertinent part by R.C. 3105.171(A)(6)(a) as "all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
"* * *
 "(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
 "(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage[.]"
"Marital property" does not include any separate property, R.C.3105.171(A)(3)(b), and is defined under R.C. 3105.171(A)(3)(a) to include:
 "(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
 "(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
 "(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage[.]"
Accordingly, any property that was owned by appellant and acquired by appellant during the marriage was marital property subject to division upon divorce. Although the court recognized this by including appellant's properties in its list of marital property, the court refused to award appellee an equal share because of appellee's conduct in prior litigation.
R.C. 3105.171(F)(9) clearly grants the trial judge broad discretion to consider any factor that it considers to be relevant in fashioning an equitable property distribution. Accordingly, the court was well within its discretion to consider appellee's past conduct with regard to the assets at issue. However, R.C.3105.171(G) provides that in any order for the division of marital property, "the court shall make written findings of fact that support the determination that the marital property has been equitably divided." Nothing in the trial court's decision indicates that it considered any factor other than appellee's past conduct under R.C. 3105.171(F)(9). Although the court stated in its decision that it considered all of the factors in R.C.3105.171(F), the only factor it discussed in its thirty-nine page decision was appellee's past conduct under (F)(9). In our view, the trial court based its property distribution entirely on appellee's past conduct and as such used R.C. 3105.171(F)(9) in a punitive manner. In creating an equitable distribution of marital property, a domestic relations court only has the authority to be punitive where one party has engaged in financial misconduct that has had a detrimental effect on the marital estate. R.C.3105.171(E)(3). In that situation, the court can compensate the offended spouse with a distributive award or with a greater award of marital property. In the present case, however, both parties benefitted by the transfer of assets to appellant's name and the trial court made it clear that it was not compensating appellant for appellee's past conduct. Rather, the court considered general principles of equity jurisprudence to conclude that appellee was not entitled to an equal share of the marital estate. In our view the overwhelming policy consideration of R.C. 3105.171 is that the court must create a property distribution that is equitable as between the parties. In its decision, the trial court failed in its obligation to do equity between the parties and, as such, created a property distribution that was arbitrary at best. Accordingly, this case must be remanded to the trial court for a redetermination of the marital property distribution.
Appellant also challenges the trial court's property distribution although in a different respect. Appellant first argues that the trial court erred in its determination of what assets comprised the marital estate because the court's total included assets that were not in existence at the time of the defacto termination of the marriage and assets that were already found to be separate property. As such, appellant contends that the trial court's valuation of the marital estate at $662,949 was in error. Although the court awarded her seventy percent of the marital assets, appellant asserts that the improper valuation of the marital estate has left her property that is in fact less than seventy percent of the marital estate.
Initially we note that the court did not specifically award appellant seventy percent of the marital estate. Rather, the court determined what it felt was an equitable distribution of the specific assets and then recognized that its distribution happened to create a seventy-thirty split. Accordingly, the fact that the court's distribution of the marital assets may not have given appellant seventy percent of the estate does not rise to aper se abuse of discretion. Nevertheless, for the following reasons, we conclude that the court's determination of the marital estate was in error.
In the present case, the trial court determined pursuant to R.C. 3105.171(A)(2) that because the parties lived separate and apart, had separate business interests and had not commingled funds since April 1, 1993, it would be inequitable to use the dates of the marriage and the final hearing to measure the duration of the marriage. Accordingly, the court held that the termination date of the marriage for purposes of property division was April 1, 1993 and awarded appellant all of the property she acquired after April 1, 1993, subject to appellee's marital portion. The problem raised by the court's termination date is that on April 1, 1993, the parties owned certain properties that they did not own on the date of the final hearing. Yet, in its listing of the marital estate, the court included properties owned as of April 1, 1993 and properties owned as of the date of the final hearing. By including properties owned on both dates, the court counted certain assets twice and included properties that were not in existence "during the marriage." In particular, appellant sold the Fripp Island property in July 1996, netting $63,396. From the amount netted, appellant paid off a $40,000 mortgage on the Old Saybrook property. Nevertheless, in comprising the marital estate, the trial court counted the $63,396 as marital property and counted the $40,000 in equity from Old Saybrook as marital property. In so doing, the court counted $40,000 in marital property twice. In addition, the court included as marital property the remaining $23,296 from the sale of Fripp Island. The evidence is undisputed, however, that those funds were used to pay Gretchen's debts and education. Moreover, the court included appellant's Cadillac as marital property after awarding the same to her as her separate property. The court then awarded the car to appellant from the marital estate causing additional confusion as to whether the asset was separate or marital property.
The court also included in the marital estate the proceeds from the sale of the assets of Shoe Dock, Inc. d/b/a/ Deborah's and valued that asset at $89,226 plus interest. The Shoe Dock assets were sold in November 1990. Under the terms of the sale, appellant was to receive seventy-two monthly payments of $1,239. Presumably from November 1990 to April 1, 1993, those payments were deposited into the parties' joint checking account and were used to pay marital expenses. It is unclear from the record where the payments went after April 1, 1993, and the court recognized this in its ruling on appellant's motion to amend findings of fact and conclusions of law. Nevertheless, the court awarded appellant the entire asset and included the $89,226 in calculating appellant's share of marital assets. By so ruling, the court disposed of at least part of an asset that was either no longer in existence or had not been sufficiently traced.
Finally, appellant challenges the trial court's inclusion in the marital estate of the insurance policy on appellee's life. The policy at issue is a Columbus Mutual Life Insurance policy with a death benefit of $200,000 and a cash surrender value of $14,525. The policy was a subject of the prior action that Blossom Treuhaft brought against the parties to recover spousal support arrears and for fraudulent conveyance. As part of the settlement reached in that case the parties agreed to maintain the $200,000 Columbus Mutual Life Insurance policy on appellee's life, with appellant as owner and beneficiary. In addition, appellant agreed "that she will notify Columbus Mutual Life Insurance Company that up to but not to exceed Fifty Thousand Dollars ($50,000.00) has been assigned to Blossom R. Treuhaft, and that the said Blossom R. Treuhaft will be named as an additional irrevocable beneficiary of said policy up to $50,000.00." In the present case, the court awarded each party one-half ownership of the policy and one-half ownership of the cash surrender value. The court then ordered:
 "Defendant shall execute such documents as are necessary to transfer a one-half (1/2) interest in the Columbus Mutual policy into Plaintiff's name. Plaintiff shall in turn execute whatever documents are necessary to release the Defendant from all court ordered obligations regarding protection of the Plaintiff's ex-spouse's entitlement to share in the proceeds of that policy. The ex-spouse's share of the insurance proceeds shall be taken from Plaintiff's interest in the policy. The Defendant shall be solely responsible for payment of the premium on the policy, and shall provide written notification of paid-up premiums upon reasonable request."
Accordingly, the court awarded appellant $100,000 of the death benefit and released her from her prior obligation to Blossom Treuhaft. The court further awarded appellant one-half of the cash surrender value of the policy, or $7,262. Appellant asserts, however, that because the policy cannot be surrendered under the terms of the prior action, the award of one-half of the surrender value of the policy is illusory.
While it is clear that under the terms of the court's prior order, appellant was obligated to maintain the Columbus Mutual Life Insurance policy on appellee's life, and, therefore, could not surrender the policy for its cash value, the court's distribution of the cash surrender value affected the parties equally. Nevertheless, the trial court will need to revisit the distribution of the life insurance policy death benefits on remand when it reevaluates the entire property distribution.
Appellant's first and second assignments of error and appellee's second assignment of error are well-taken.
Appellant's fourth assignment of error and appellee's first assignment of error address various aspects of the trial court's order regarding spousal support and will be discussed together.
In its order, the trial court denied appellee's request for spousal support on the ground that appellee had not established a need for such support at that time. The court however then determined that its order was subject to modification for a period of four years from the date of the final entry of divorce in the event of a substantial change in circumstances affecting appellee's earning ability, aside from voluntary retirement. Appellee argues that the court erred in failing to award him any spousal support and appellant argues that the court erred in reserving jurisdiction to modify its order when it did not award any spousal support.
In Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 130, the Supreme Court of Ohio stated that "[a]fter a divorce has been granted, the trial court is required to equitably divide and distribute the marital estate between the parties and thereafter consider whether an award of sustenance alimony would be appropriate." See, also, R.C. 3105.18(B). The determination of the need for and amount of sustenance alimony is a matter within the discretion of the domestic relations court. Kunkle v. Kunkle
(1990), 51 Ohio St.3d 64, 67. In exercising that discretion, the court must look to the factors set forth in R.C. 3105.18(C). One of those factors is "[t]he income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171
of the Revised Code[.]" R.C. 3105.18(C)(1)(a). In the present case, the lower court's reevaluation of the property distribution on remand may affect that court's view of the spousal support issue. Accordingly, the issue of spousal support is not yet ripe for review and we will not consider the merits of appellee's argument on this issue at this time.
Appellant asserts that the trial court erred in retaining jurisdiction over the spousal support issue where the court found that appellee had not established a need for such support in the proceedings below. Because the issue of spousal support will be reevaluated upon remand, this issue is also not yet ripe for review. Nevertheless, we note that this court has previously held that a court cannot retain jurisdiction over the issue of spousal support if it does not enter an order of spousal support in the first place. Hall v. Hall (Feb. 11, 1994), Wood App. No. 93WD045, unreported.
Accordingly, appellant's fourth assignment of error and appellee's first assignment of error are not ripe for review.
Appellant's third assignment of error and appellee's third assignment of error each challenge the trial court's award of partial attorney fees to appellee. Appellant contends that the court erred in awarding appellee any attorney fees and appellee asserts that the court erred in not awarding him full attorney fees. When attorney fees are awarded in a divorce proceeding, they are awarded as part of spousal support. R.C. 3105.18(H). As such, the court must consider those same factors contained in R.C.3105.18(C) that it considered when making a spousal support award.Colello v. Colello (Aug. 9, 1996), Lucas App. No. L-95-322, unreported. Because the property division and spousal support issues must be reexamined by the court below, we find that the award of attorney fees is not ripe for review and we cannot at this time consider the merits of appellant's third assignment of error or appellee's third assignment of error.
Finally, in his fourth assignment of error and in his pending motion, appellee asserts that appellant should pay the costs and attorney fees that he has incurred in the prosecution of this appeal. Appellee has voluntarily withdrawn his fourth assignment of error in light of his pending motion on the same issue.
App.R. 23 provides: "If a court of appeals shall determine that an appeal is frivolous, it may require the appellant to pay reasonable expenses of the appellee including attorney fees and costs." "A frivolous appeal under App.R. 23 is essentially one which presents no reasonable question for review."Talbott v. Fountas (1984), 16 Ohio App.3d 226, 226. Given our rulings on the parties' assignments of error, we cannot say that the present appeal presented no reasonable question for review. Appellee's motion for attorney fees and costs is therefore not well-taken and denied.
On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division is reversed. This cause is remanded to that court for an equitable division of the marital property and, based on that determination, a redetermination of appellee's request for spousal support and attorney fees. The parties are ordered to pay their own costs of this appeal.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J., Richard W. Knepper, J., MarkL. Pietrykowski, J., concur.